UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DEVEN HAMMOND, | ) | CASE NO._____ |
| | ) | |
| Plaintiff, | ) | JUDGE. |
| v. | ) | |
| | ) | |
| DAN DISCH, in his individual capacity; | ) | |
| UNIVERSITY OF SOUTHERN | ) | |
| MISSISSIPPI; ATHLETIC PROGRAM | ) | CIVIL ACTION |
| DOE, in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT AND JURY DEMAND

BIZER & DEREUS, LLC
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Jacqueline K. Hammack (LA # 34581)
jhammack@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

LAW OFFICE OF WILLIAM MOST, L.L.C.
Louisiana Bar No. 36914
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (650) 465-5023
Email: williammost@gmail.com

1

## I.      INTRODUCTION

1.      Deven Hammond is an exceptional scholar-athlete. Growing up in Brusly, Louisiana, he played three years of football at Brusly High School and one year at Port Allen High School. Deven was selected to be an All-American athlete. He graduated from Port Allen High in 2015 with a 3.4 GPA.

2.      Like a number of professional and college football players,[1] Deven has only one kidney. That does not, however, affect his ability to play football. He has never had any kidney-related problems during games or practice. In 2013, the Times-Picayune wrote a story about Deven entitled "Being born with one kidney hasn't slowed Brusly's Deven Hammond."[2] And every single nephrologist who examined Deven cleared him to play football.



**Fig. 1**: Deven Hammond (Number 2) running back an interception. He wears the Number 2 jersey in memory of his great grandmother who helped raise him.

3.      After graduating high school in 2015, Deven was recruited to the Louisiana State University football team. He played Defensive Back at LSU during his freshman year.

4.      Due to his strong freshman performance, Coach Dan Disch of the University of Southern Mississippi ("USM") reached out to him and invited Deven to transfer to USM. Coach Disch told him that USM was graduating a large class of players and they needed

---

[1] *E.g.*, Dominique Rodgers-Cromartie of the New York Giants, Mark Seay of the San Diego Chargers and Philadelphia Eagles, Seth Edeen of Wyoming State, Julius Davis of University of Wisconsin-Platteville, *etc*.
[2] James Smith, *Being born with one kidney hasn't slowed Brusly's Deven Hammond*, New Orleans Times-Picayne, December 5, 2013.

Deven's help to rebuild the team. Based on his past performance, Coach Disch told Deven that he would likely be soon leading the defensive team. And most enticingly, he promised Deven a full-ride scholarship to USM if he made it onto the football team's second string or better after a semester. On the basis of those promises, Deven withdrew from LSU and transferred to USM.

5.      When Deven got to USM, he went to the university's Student Health Services Center for an athlete physical. The Health Services Center noted that he only had one kidney, ran lab work on him, and then declared that Deven was **"healthy and cleared for all activity without restriction"** and was **"Able to Compete."** Accordingly, Deven began practicing with the USM football team.

6.      On June 28, 2017, Deven mentioned in passing to Head Athletic Trainer, Todd McCall, that he only had one kidney. Mr. McCall immediately had Deven stop practicing. He took Deven to see Dr. Beam, a family medicine doctor who acted as the team's physician. In a brief consultation, Dr. Beam checked Deven's vitals and looked at his medical records. He confirmed that Deven was healthy, but said "I just can't clear you to play."He highlighted to Deven and Mr. McCall the "liability of this condition" to USM.

7.      Deven was distressed – football was his passion. But he looked through the USM Sports Medicine Policies and Procedures, and found something promising: it is USM's policy that a "student athlete may elect to seek a second opinion in all matters of health and injury." The student athlete can then be "cleared to participate in team activities" once "written documentation is received from the second opinion physician." (Exhibit A at 2-3.)

8.      Accordingly, Deven spoke with his kidney specialist, nephrologist Dr. Raynold Corona. Dr. Corona wrote a letter to USM, explaining that "[t]his patient is currently under my care. I do not feel it is necessary to place any restrictions on this patient for playing football." (Ex. B.) Dr. Corona also spoke on the phone with Head Athletic Trainer Todd McCall.

9.      But USM still refused to allow Deven to play football. Deven called Mr. McCall

3

and asked why, considering that his nephrologist had cleared him. Mr. McCall suggested that Dr. Corona's letter was too short, and said that the doctor could submit a lengthier one explaining the care Deven was provided, why football wouldn't be a problem, and "why this isn't going to be a liability issue and your health." Mr. McCall said that "we're just looking after you. . . you're going to be the only one who suffers."

10.     Deven later found out that Associate Athletic Daniel Feig was speaking in bad faith. A month earlier, Mr. Feig had received an email from the Director of Athletic Compliance that "a second opinion by a doctor of Deven's choosing would not result in a change to Deven's clearance."

11.     Dr. Corona wrote a more detailed letter, explaining Deven's medical history, the history of Dr. Corona's care, and the risks associated with Deven having only one kidney. Dr. Corona concluded that the risks of a kidney injury from football are "incredibly slim and I suspect he has much greater risks from driving around town in his car. . . . I feel the patient should not be prohibited from playing football based on the presence of a solitary kidney." (Ex. C.)

12.     Dr. Corona called Mr. McCall, Dr. Beam, and Mr. Feig. He left voicemails for each. None returned his call.

13.     Because USM had repeatedly brought up their concern about Deven's condition risking "liability" to the university, Deven offered to sign a waiver of liability. USM's policy explicitly allow for such a waiver when a student athlete has a pre-existing medical condition. Ex. A at 4.

14.     Despite Dr. Corona's detailed explanation of why Deven was cleared to play football, and despite Deven's offer to sign a waiver of liability, Mr. Feig wrote to Deven that their decision would not change – "you have not been medically cleared to participate in collegiate athletics at Southern Miss."

4

15.     To add insult to injury, the USM Athletic Department also interfered with Deven's ability to play at other schools. After being told he could not play at USM, Deven reached out to Middle Tennessee State University. He was told, however, that Middle Tennessee had heard that he only had a kidney problem and did not pass a physical – and so their coach was "not interested."

16.     What USM did to Deven is illegal. It has been black-letter law since the 1980's that barring a student with one kidney from play football after he offers to sign a waiver of liability is a violation of federal anti-discrimination laws. *Grube v. Bethlehem Area School District*, 550 F.Supp  418 (E.D. Pa. 1982) (a football team's doctor advised against a student with one kidney playing football, but an expert cleared him to play and the student offered to sign a waiver of liability. The court granted a preliminary injunction, because "the plaintiff is being deprived of an important right guaranteed by federal legislation.")

17.     As one court put it, the purpose of federal anti-discrimination laws is "to permit handicapped individuals to live life as fully as they are able, without paternalistic authorities deciding that certain activities are too risky for them." *Poole v. South Plainfield Board of Education,* 490 F.Supp. 948, 953-954 (D.N.J.1980)

18.     Furthermore, USM's decision to falsely tell other schools that Deven had failed a physical (when in fact he had *passed* the USM physical) was an act of defamation – as well as a violation of HIPAA and FERPA.

19.     In sum, USM's Athletic Program overrode the determinations of their own Health Services Center and Deven's treating nephrologist, and then refused to follow their own second-opinion and waiver policies – all to prevent Deven from playing on the team.

20.     Why did they do this? Their motivation can be inferred from their own words. Daniel Feig called Deven having one kidney a "liability issue." Dr. Beam raised the issue of "the liability of this condition." Mr. McCall consulted Dr. Thornton about the "liability of the

5

institution." And the July 17 memo concluded that Deven's condition could "be costly to the institution and Athletic Department."

21.     Protecting the USM's Athletic Program – not Deven's health – was the guiding star of Defendants' decisions. For that reason, they violated federal anti-discrimination statutes.

## II.     JURISDICTION AND PARTIES

22.     This is an action for relief pursuant to Title II of the Americans With Disabilities Act, 42 U.S.C. § 12131 *et seq.* and the Rehabilitation Act, 29 U.S.C. §794(a) *et seq*. This Court is vested with original jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

23.     This court is vested with supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 as this claim arises out of the same case or controversy as the federal claim.

24.     Defendants have purposefully availed themselves of the privilege of doing business in the State of Louisiana by asserting themselves into the State of Louisiana and soliciting Deven from Louisiana. *Infra*. This action arises out of and relates to defendants' contacts in the State of Louisiana. Accordingly, this Court has personal jurisdiction over defendants.

25.     This Court's exercise of personal jurisdiction over defendants would comport with the notions of fair play and substantial justice because defendants solicited Deven from Louisiana and thereby subjected themselves to jurisdiction in Louisiana.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omission giving rise to one of the claims in this action occurred in the Middle District of Louisiana.

27.     **Plaintiff Deven Hammond** is a citizen and resident of Baton Rouge, Louisiana. He is disabled within the meaning of the ADA and RA.

28.     **Defendant Dan Disch** is a resident of Mississippi who has conducted business in

the State of Louisiana, including actions which have a nexus to this action. Mr. Disch is sued solely in his individual capacity.

29.     **Defendant University of Southern Mississippi** is a resident of Mississippi. Defendant University of Southern Mississippi is a state entity and a recipient of federal funding.

30.     **Defendant Athletic Program Doe** is an unknown person who communicated information about Deven's medical condition to a person at Middle Tennessee State University.

### III.    FACTS

**A.    Deven Hammond's Exceptional High School Football Career**

31.     Deven Hammond grew up in Brusly, Louisiana.  At Brusly High School, Deven played three years of high school football and finished his senior season at Port Allen High School.

32.     In his senior year at Port Allen, Deven was chosen to participate, along with over eighty of the best high school seniors in the country, in the Offense-Defense All-American Senior Bowl. The Offense-Defense Bowl is an annual high school football all-star game which, spotlights the nation's top high-school seniors. The game is played in an East versus West format with the top players being determined based on talent, prospective college impact and potential NFL upside.[3]

33.     Deven was widely considered a strong prospect for college football. One scouting website described Deven as an "Excellent special teams player who could fill a variety of roles at the collegiate level."[4] Another site described him as a "sure-handed tackler, [who] plays the ball at its highest point, and has a nose for the ball. He has an extremely high football IQ. "[5]

---

[3] http://www.thewestsidejournal.com/hammond-headed-to-offense-defense-all-american-bowl/
[4] https://247sports.com/Player/Deven-Hammond-33522?PlayerInstitution=69364
[5] http://www.varsitypreps.com/breakout-player-db-from-brusly-hs-deven-hammond-is-making-his-move/

34.    Deven was born with only one kidney. That does not, however, affect his ability to play football. His doctors cleared him to play football each year of high school, and he has never had any kidney-related problems during games or practice. In 2013, the Times-Picayune wrote a story about Deven entitled "Being born with one kidney hasn't slowed Brusly's Deven Hammond."[6] Deven explained to the newspaper what football means to him, particularly in the context of having only one kidney:

> I found out when I was younger that I was born with only one kidney . . . I was just playing baseball when I was little. I used to always ask my doctor if I could play football and his answer was always the same. 'Let's do the test and scans and see if things have changed.' Well, it was the same answer all the time. No. As I got a little older I started to do some research on guys that played football with one kidney and I learned that Dominique Rodgers-Cromartie also has one kidney. It kind of inspired me. He became an inspiration.

> I really love this game . . . Whenever you want something so bad and you can't have it, once you get it, you just want to keep it and never let go. I just want to keep playing the game and let nothing take it from me.

> When I was younger, I always thought of my great grandmother. I always stayed with her. When I was six she passed away. She always told me about a dream house that she wanted. I know she is heaven now and everything, but I feel like I still want to provide her with that. I wear number two because my grandma was born in January. With me, God is always first so I wear two for her.

35.    Kidney injuries during football are rare. In a University of Utah study of 23,666 injuries in collision-prone sports, just 18 were kidney injuries.[7] Those 18 were fairly mild; none involved catastrophic kidney injuries that required major medical care.

36.    In contrast to the 18 kidney injuries, the study found 3450 knee, 2069 head/neck/spine, 1219 mild traumatic brain, 148 eye, and 17 testicle injuries.

37.    The authors concluded: "These data do not support limiting sport participation by athletes with single kidneys."

---

[6] James Smith, *Being born with one kidney hasn't slowed Brusly's Deven Hammond*, New Orleans Times-Picayne, December 5, 2013.
[7] Matthew Grinsell, *et al.*, *Sport-Related Kidney Injury Among High School Athletes*, Pediatrics, Vol. 130, Iss. 1 (July 2012).

**B.** **Deven Plays for a Year at LSU and then is Recruited to USM on the Promise of a Full-Ride Scholarship**

38. In 2015, Deven graduated Port Allen High School with a 3.4 GPA and was recruited to the Louisiana State University football team. He played Defensive Back at LSU during his freshman year.

39. Due to his strong freshman performance, Coach Dan Disch of the University of Southern Mississippi ("USM") reached out to him and invited Deven to transfer to USM. Coach Disch told him that USM was graduating a big class of players and they needed Deven's help to rebuild the team. Based on his past performance, Coach Disch told Deven that he would likely be soon leading the defensive team. And most enticingly, he promised Deven a full-ride scholarship to USM if he made it onto the football team's second string or better after a semester.

40. On the basis of those promises, Deven withdrew from LSU. He couldn't immediately begin at USM, so he sat out for a year and took online classes from a two-year college. He then transferred to USM in 2017.

41. In sum, defendants USM and Disch reached into Louisiana and solicited Deven to come to Mississippi. But for the solicitation into Louisiana by USM and Disch, Deven would not have gone to USM and he would not have experienced the injuries and discrimination that is the subject of this action.

**C.** **Deven is "Cleared for All Activity" and Determined "Able to Compete" in his USM Athlete Physical**

42. To be cleared to play on the USM team, Deven had to take an athlete physical. On June 2, 2017, he went to the university's Student Health Services Center for the athlete

physical.  He disclosed that he had only been born with one kidney. The Health Services Center

checked him out, ran lab work on him, and then declared that Deven was "healthy and cleared

for all activity without restriction." *See* Figure 2, below.



## Assessment:
### Diagnoses:
Encounter for examination for participation in sport
Encounter for screening for diseases of the blood and blood-forming organs and certain
disorders involving the immune mechanism
### Assessment Note:

## Plan:
### Provider Note:
Pt is healthy and cleared for all activity without restriction. Pt instructed to return to clinic for
any new complaints or concerns.
### Nurse Note:

**Fig. 2**: Excerpt from Deven's June 2, 2017 Athlete Physical.

43.     Also on June 2, 2017, the USM medical staff filled out a USM Athletic Department Physical Information form. In two places, the form asked "Able to Compete – Yes/No." In both places, the medical staff circled "Yes." *See* Figure 3.

44.     Deven began practicing with the USM football team without any incident.

**D.   Assistant Director of Athletics Todd McCall Finds Out Deven Has One Kidney and Pulls Him Off the Team**

45.     On June 28, 2017, Deven mentioned in passing to Assistant Director of Athletics Todd McCall that he only had one kidney.

46.     Mr. McCall immediately had Deven stop practicing. He took Deven to see Dr. Stephen Beam.

47.     Dr. Beam is not a nephrologist or kidney expert. He is a family medicine doctor



| Phy Findings | Normal/Abnormal |
|---|---|
| HEENT | NWl |
| DENTAL | |
| CV | |
| LUNGS | |
| ABDOMEN | |
| HERNIA | |
| GENITALIA | |
| SKIN | |
| NEUROLOGIC | |
| **Able to Compete** | Yes / No |
| **MD Signature** | |

| ORTHOPEDIC | |
|---|---|
| Neck | NWl |
| Shoulders | |
| Elbows | |
| Wrist/Hand | |
| Back | |
| Knees | |
| Ankles | |
| Feet | |
| **Able to Compete** | Yes / No |
| **MD Signature** | |

**Fig. 3**: Excerpt from Deven's USM Athletic Department Physical Information form.

who provides services to the USM athletic program.  In a brief consultation, Dr. Beam checked Deven's vitals and looked at his medical records. He confirmed that Deven was healthy, but said "I just can't clear you to play." He did not conduct any lab work or internal testing or explain why he disagreed with the Student Health Services Center's clearing of Deven to compete. Dr. Beam did, however, describe the "liability of this condition" to USM.

48.     On July 17, 2017, Todd McCall wrote a private memorandum to Executive Associate Athletics Director Daniel Feig. The memorandum described how Mr. McCall had discussed the kidney issue with Deven, and how they "dealt with another student athlete (football player) that had this same condition and understands the decisions that were made on that student athlete's behalf as well." It explained that "Dr. Beam did indeed have a short discussion with Mr. Hammond explaining to him the liability of this condition, as well as the fact that we could not allow him to participate." The memo also listed "reasons for this non-clearance," ranging from the risk of a "blow to the kidney" to "dehydration issues leading to possible kidney stone formation."  In the memo, Mr. McCall disclosed that he had spoken with a nephrologist, Dr. Thornton, "pertaining to liability of the institution and the student athlete" and that "Dr. Thornton agreed that this condition would bring an increase of liability to the student athlete for the reasons listed above."  (Dr. Thornton never examined Deven.)

49.     Mr. McCall's memo concluded that although the risk of "a blow to the kidney that would lead to renal failure would be low," the health concerns could be "costly to the institution and Athletic Department, but more so the student athlete."

50.     On July 18, 2017, Anthony Martinez, Director of Athletic Compliance, wrote an email to Jon Gilbert (Director of Athletics), Daniel Feig, and Todd McCall. He says: "Todd and I spoke with Deven and his mother today via phone. . . We were able to communicate with the mother about how important it is for USM to trust and rely on the decisions made by the doctors and our unwillingness to overrule the decision based on their medical expertise . . .

11

[even though Deven] has been cleared by other doctors in the past . . . a second opinion by a
doctor of Deven's choosing would not result in a change to Deven's clearance."

51.     Later that day, Deven went to Todd McCall's office. He and Mr. McCall
discussed the situation for close to forty-five minutes. Mr. McCall reiterated that Deven was not
cleared to play on the team, and then shocked Deven by threatening what he would say to other
schools. He said to Deven:

> Big Daddy,[8] if a school calls and asks, I'm not going to lie to them about the
> situation. I sleep better at night knowing that you're not playing somewhere on a
> field. I hope and pray I never turn my TV on and see you hurt in critical condition
> with a kidney injury.

52.     Deven began to reach out to other schools in case he couldn't persuade USM to
let him play. One school he reached out to was Middle Tennessee State University. But on July
27, 2017, Deven received text messages from a player there: "Coach Stock just hit me back. He
said according to y'all doctors, you have a kidney problem and haven't passed a physical."
Deven explained that he has one kidney but is healthy and had passed USM's physical. The
player followed up that he had talked to Coach Stock and "[h]e said that he [is] not interested."

### E.     USM Refuses to Follow Their Own Second-Opinion and Waiver Policies, Refusing to Listen to Deven's Treating Nephrologist

53.     So Deven sought another solution. He looked through the USM Sports Medicine
Policies and Procedures, and found something promising: it is USM's policy that a "student
athlete may elect to seek a second opinion in all matters of health and injury." The student
athlete can then be "cleared to participate in team activities" once "written documentation is
received from the second opinion physician." (Exhibit A at 2-3.) He also found a policy that
addressed the school's liability concerns: "the University may have the student athlete and
his/her parents sign a waiver releasing the University of its obligations for pre-existing
conditions." *Id.* at 4.

---

[8] "Big Daddy" is how Mr. McCall would address some members of the USM football team.

54.     Accordingly, Deven spoke with his kidney specialist, Dr. Raynold Corona. Dr. Corona is a nephrologist affiliated with the Baton Rouge General Medical Center, Our Lady Of The Lake Regional Medical Center, and Saint Elizabeth Hospital.

55.     On August 1, 2017, Dr. Corona wrote a letter to USM, explaining that "[t]his patient is currently under my care. I do not feel it is necessary to place any restrictions on this patient for playing football." (Ex. B.) Dr. Corona also spoke on the phone with Head Athletic Trainer, Todd McCall.

56.     But USM still refused to allow Deven to play football. Deven called Mr. McCall and asked why, considering that the kidney specialist had cleared him. Mr. McCall suggested that Dr. Corona's letter was too short, and said that the doctor could submit a lengthier one explaining the care Deven was provided, why football wouldn't be a problem, etc.

57.     On that call, Mr. McCall said Deven's doctor could explain why he "does not believe that football is going to be something that is going to be a high liability for you."

58.     On that call, Mr. McCall said that "we're just looking after you, buddy, that's all . . .  you're the only one in the end that's going to be the one that suffers. . . And that's what we've got to think about when we make medical decisions for our athletes."

59.     On that call, Mr. McCall said they had in the past "disqualified" another student athlete who had only one kidney.

60.     On August 27, 2017, Deven spoke on the phone with Coach Disch. He described that he was willing to sign a waiver releasing the school of liability for his condition. He also mentioned how disappointed he was to miss out on football as well as losing the scholarship that Coach Disch had promised him – and that these would have been such "a good opportunity for me."

61.     As Deven explained the situation, including the fact that his scholarship was "the plan" if he was two deep by second semester, Coach Disch agreed with him.

62.     After Deven said "it would have been more of an opportunity for me to get that scholarship," Coach Disch replied: "no doubt about it. . . .  that's why I was trying to get you to do it."

63.     On September 5, 2017, Dr. Corona wrote a more detailed letter, explaining Deven's medical history, the history of Dr. Corona's care, and the risks associated with Deven having only one kidney. Dr. Corona concluded that the risks of a kidney injury from football are "incredibly slim and I suspect he has much greater risks from driving around town in his car. . . . I feel the patient should not be prohibited from playing football based on the presence of a solitary kidney." (Ex. C.)

64.     Dr. Corona also called Todd McCall, Dr. Stephen Beam, and Daniel Feig. None of them took his call, so he left voicemails for each of them.

65.     None of them called Dr. Corona back.

66.     On September 5, 2017, Deven wrote an email to Austin Cox, Daniel Feig, and Todd McCall, attaching the letter from Dr. Corona. He explained that:

> It is really important to me to be able to play football. That's because I love the game and also so that I can be eligible for the scholarship promised if I was in the two deep by next year. So I hope you all will really consider Dr. Corona's letter. Like I mentioned before, I'm happy to sign the waiver releasing the University from obligations for my preexisting condition.

67.      The next day, Mr. Feig wrote to Deven that their decision would not change – "you have not been medically cleared to participate in collegiate athletics at Southern Miss." Mr. Feig did not deny that Deven had been promised a scholarship.

68.     On September 11, 2017, Deven's counsel wrote a letter to Dr. Rodney Bennett, President of USM. The letter explained that: "The Federal Rehabilitation Act of 1973 and the Americans With Disabilities Act both bar discrimination against students with disabilities at schools that receive federal financial assistance.  Courts have consistently interpreted these laws to bar discrimination in athletic programs against student athletes who only have one kidney."

69.     It cited *Poole v. South Plainfield Board of Education,* 490 F.Supp. 948

(D.N.J.1980), in which the court explained that "[t]he purpose of § 504 [of the Rehab Act],

however, is to permit handicapped individuals to live life as fully as they are able, without

paternalistic authorities deciding that certain activities are too risky for them." The letter invited

the school to "work together to find a way to remedy [the problems] and ensure they do not

happen again in the future."

> **F.      USM Refuses to Listen to "Any Nephrologist in the World" Except the One Who Had Already Been Consulted – Without Examining Deven – About the "Liability of the Institution."**

70.     In response to the September 11 letter, the school invited Deven to be evaluated

by Dr. Thornton. The school did not, however, disclose what Mr. McCall had written in his July

17 memo – that Dr. Thornton had already come to a conclusion about Deven's "liability [to] the

institution" without having examined him.

71.     On September 20, 2017, Deven's counsel pointed out that Deven was

understandably wary of a doctor associated with USM, and proffered an alternative: "that if Dr.

Corona's opinion was in some way inadequate, we choose a neutral nephrologist - one who is

not associated with either USM or Mr. Hammond."

72.     On September 27, 2017, the University responded: "The University has

reviewed and considered your request for an additional examination of Mr. Hammond by a

mutually-agreed upon nephrologist.  We respectfully decline your request as Dr. Thornton was

previously consulted in regard to Mr. Hammond's situation."

73.     The next day, Deven's counsel wrote back: "The fact that USM will not listen to

the opinion of *any nephrologist in the world* aside from their own - even though USM's written

policy allows for outside medical opinions - further suggests that Mr. Hammond has been

subject to illegal discrimination."

74.     On October 10, 2017, the University confirmed that it would only listen to Dr.

Thornton.

75.     The reason for USM's behavior is clear – Dr. Thornton had expressed an opinion

without examining Deven. And USM liked that opinion. But every nephrologist who had

*actually examined* Deven had cleared him to play football (as well as USM's own Health

Services Center). A mutually-agreed upon nephrologist might give USM an answer it didn't

want to hear.

76.     In sum, USM's Athletic Program overrode the determinations of their own

Health Services Center and Deven's treating nephrologist and then refused to follow their own

second-opinion and waiver policies – all to prevent Deven from playing on the team.

77.     The reason why is found in the conclusion of Mr. McCall's July 17

memorandum: Deven's condition could be "be costly to the institution and Athletic

Department."

78.     By and through the discrimination and actions of defendants, Deven has suffered

the following injuries: emotional distress, anxiety, humiliation, invasion of his civil rights,

segregation, loss of his scholarship, loss of earning capacity, invasion of privacy, invasion of his

confidential medical information, and defamation.

## IV. CAUSES OF ACTION

### Count  I – Violation of Title II of the Americans With Disabilities Act
(Against University of Southern Mississippi)

79.     Plaintiff re-allege and incorporate by reference the above allegations set forth in

the Complaint as if fully set forth herein.

80.     Title II of the ADA protects qualified individuals from discriminatory practices

by state entities. 42 U.S.C. §12131 *et seq.*

81.     According to the ADA, "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."
42 U.S.C. §12132.

82.    Deven Hammond is a qualified individual as that term is defined in the ADA.

83.    But even if he were not, he would still be protected. The ADA also protects persons who are regarded by a public entity as having a physical or mental impairment that substantially limits a major life activity, whether or not that person actually has an impairment.

84.    The U.S. Department of Justice's  ADA Technical Assistance Manual highlights that the ADA can be violated when a person is not allowed to participate in a sport, even though their actual medical condition does not prevent them:

> ILLUSTRATION: A, an individual with mild diabetes controlled by medication, is barred by the staff of a private summer camp from participation in certain sports because of her diabetes. Even though A does not actually have an impairment that substantially limits a major life activity, she is protected under the ADA because she is treated as though she does.

85.    Here, Deven Hammond was excluded from participation in, denied the benefits of services, programs, or activities, and otherwise discriminated against when the University of Southern Mississippi took him off the football team and revoked their offer of a full-ride scholarship.

86.    USM also discriminated against Deven Hammond when they refused to follow their own second-opinion and waiver policies.

87.    This exclusion, denial of benefits, and discrimination was by reason of Deven's disability or by reason of USM's treatment of him as if he were disabled.

88.    USM discriminated against Deven by excluding  him  from participation in, and denying the benefits of, USM's services, programs, and/or activities because  of Deven's disability, all in violation of 42  U.S.C.  § 12132.

89.    USM discriminated against Deven by denying him full access to the services, programs, and/or activities, in violation of U.S.C. §12132 and its  implementing

regulations 28 C.F.R. Part 35.101-35.190 *et. seq.*

90.     Deven has retained the undersigned counsel and is entitled to recover reasonable attorneys' fees, costs and litigation expenses from USM pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.

**Count II – Violation of the Rehabilitation Act**
(Against University of Southern Mississippi)

91.     Plaintiff re-allege and incorporate by reference the above allegations set forth in the Complaint as if fully set forth herein.

92.     Like the ADA, Section 504 of the Rehabilitation Act protects disabled persons from discrimination by public entities. 29 U.S.C. § 794(a) *et seq.*

93.     USM is a recipient of federal financial assistance.

94.     Deven Hammond is a qualified individual as defined in the Rehab Act.

95.     Here, Deven Hammond was excluded from participation in, denied the benefits of services, programs, or activities, and otherwise discriminated against when the University of Southern Mississippi took him off the football team and revoked their offer of a full-ride scholarship.

96.     This exclusion, denial of benefits, and discrimination was by reason of Deven's disability or by reason of USM's treatment of him as if he were disabled.

97.     Courts have consistently interpreted the Rehab Act to bar discrimination in athletic programs against student athletes who only have one kidney.

98.     In *Poole v. South Plainfield Board of Education,* 490 F.Supp. 948 (D.N.J.1980), a student athlete with only one kidney was barred from his school's wrestling team. The school's doctor declined to clear him, but the student athlete's doctors cleared him. Poole offered to sign a waiver. Accordingly, the court held that Poole had shown a right to recovery because "[t]he purpose of § 504 [of the Rehab Act], however, is to permit handicapped individuals to live life as

18

fully as they are able, without paternalistic authorities deciding that certain activities are too risky for them." *Id.* at 953-954.

99.    In *Grube v. Bethlehem Area School District*, 550 F.Supp  418 (E.D. Pa. 1982), the court applied the principles of *Poole* to football. Like in *Poole,* the team doctor advised against the Grube's participation, but an expert cleared him to play. Grube offered to sign a waiver. The court granted a preliminary injunction requiring the school to allow Mr. Grube to play football, because "the plaintiff is being deprived of an important right guaranteed by federal legislation." *Id.* at 424.

100.    These cases have become basic black-letter elements of sports law. *See, e.g.,* Walter Champion, *Sports Law in a Nutshell* (2017) ("Under § 504, a high school student with one kidney must  be  allowed  to  play football if  his  parents  sign  a  waiver", citing  *Grube*); Matthew J. Mitten, *Sports Law in the United States* (2011) ("in *Grube*  . . . the court ruled that the Act required a high school to permit a student-athlete with one kidney to play football if he wore a protective flak jacket").

101.    By and through the actions of USM, as fully set forth above, USM violated the Rehabilitation Act of 1973.

102.    Upon information and belief, a non-exclusive list of USM's violations of the Rehabilitation Act and discriminatory conduct against Deven are evidenced by:

> A.    denying Deven access to, and the opportunity to participate in or benefit from, the aids, benefits, activities, programs, accommodations and services offered at the Property;

> B.    by otherwise limiting Deven in the enjoyment of the rights, privileges, advantages and opportunities enjoyed by individuals without disabilities;

> C.    failing to administer services, programs and activities in the most

19

integrated setting appropriate to Deven's needs;

D.      excluding Deven from participation in, and the benefits of, USM's services programs and activities;

E.      interfering with with Deven's attempt to obtain the use of services or accommodations of a public accommodation; and

F.      denying Deven a reasonable accommodation that was necessary to afford his participation in the services or benefits offered by a public accommodation.

103.    Deven has been obligated to retain undersigned counsel for the filing and prosecution of this action. Deven is entitled to recover attorneys' fees, costs and litigation expenses from USM pursuant to 29 U.S.C. §794(b).

### Count III – Negligent Disclosure of Information
(Against Athletic Program Doe and USM)

104.    Plaintiff re-allege and incorporate by reference the above allegations set forth in the Complaint as if fully set forth herein.

105.    Under Mississippi law, to prevail on a claim of negligence the "plaintiff must establish by a preponderance of the evidence each of the elements of negligence: duty, breach, causation and injury." *Miss. Dep't of Mental Health v. Hall*, 936 So.2d 917, 922 (Miss. 2006).

106.    HIPAA and FERPA establish a legal obligation for Athletic Program Doe not to release a student's medical information without the student's permission.

107.    Athletic Program Doe, as an agent of USM, had a duty to not release Deven's medical information to Middle Tennessee State University.

108.    Athletic Program Doe breached that duty when he released information about Deven's medical history to a person at Middle Tennessee State University.

109.    That release of information caused Middle Tennessee State University to not offer

20

Deven an invitation to join their football team, which damaged Deven.

110.    Athletic Program Doe is liable to Deven for his release of Deven's protected information.

### Count IV – Breach of Contract / Promissory Estoppel
(Against Defendants Dan Disch and USM)

111.    Plaintiff re-allege and incorporate by reference the above allegations set forth in the Complaint as if fully set forth herein.

112.    USM and Deven entered into a contract when Defendant Dan Disch promised Deven that if he transferred from LSU to USM, they would provide him with a full-ride scholarship if he were second string or better on the football team after one semester.

113.    Deven fulfilled his side of the contract by transferring from LSU to USM. USM breached the contract by not letting him play football even though his nephrologist and their own Health Services Center cleared him to play. Deven was harmed by this breach.

114.    Defendant Dan Disch is liable under the principle of promissory estoppels because: (a) Defendant Dan Disch made a promise to Deven significant enough to cause Deven to act upon it; (b) Deven relied on the promise by withdrawing from LSU, selling his car, taking a year off, and then transferring to USM; (c) Deven suffered a significant detriment when, after all of this, USM and Dan Disch did not let him play football even though his nephrologist and their own Health Services Center cleared him to play.

### V. Relief Requested

WHEREFORE, Plaintiff demands judgment against Defendants, and request the following relief:

A.    That this Court declare that USM discriminated against Deven in a manner that violates the ADA and Rehabilitation Act;

B.    That this Court award damages on behalf of the Plaintiff against Defendants;

C.    That this Court award reasonable attorneys' fees and costs (including expert fees)

and other expenses of suit; and

D.    That this Court awards such other and further relief as it deems necessary, just,

proper, and appropriate.

Plaintiff requests a jury on the issue of quantum of damages.

Respectfully submitted, this the 29th day of November, 2017,

By Plaintiff, by and through his counsel,

/s/ *Jacqueline K. Hammack*                          /s/ *William Most*

Bizer & DeReus, LLC                                  Law Office of William Most, L.L.C.

Garret S. DeReus (LA # 35105)                   Louisiana Bar No. 36914

gdereus@bizerlaw.com                         201 St. Charles Ave., Ste. 114 #101

Andrew D. Bizer (LA # 30396)                  New Orleans, LA 70170

andrew@bizerlaw.com                        Tel: (650) 465-5023

Jacqueline K. Hammack (LA # 34581)        Email: williammost@gmail.com

jhammack@bizerlaw.com

3319 St. Claude Ave.

New Orleans, LA 70117

T: 504-619-9999; F: 504-948-9996

22